Pete ARCEO, Plaintiff,

v.

CITY OF JUNCTION CITY, KANSAS, Jeffrey Clark, J.M. Warren, and Suzanne Lueker, Defendants.

No. 00–1320–JTM.

United States District Court, D. Kansas.

Jan. 17, 2002.

Pedro L. Irigonegaray, Robert V. Eye, Irigonegaray & Associates, Timothy H. Girard, Bruce J. Woner, R. Patrick Riordan, Woner, Glenn, Reeder, Girard & Riordan, P.A., Topeka, KS, for Plaintiff.

Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, David P. Madden, Linda Monroe Davenport, Fisher, Patterson, Sayler & Smith, Overland Park, KS, Arthur S. Chalmers, Bradley Joseph LaForge, Hite, Fanning & Honeyman L.L.P., Marc A. Powell, David L. Vogel, Powell, Brewer, Gough & Withers, L.L.P., Dustin L. DeVaughn, Richard W. James, McDonald, Tinker, Skaer, Quinn & Herrington, P.A., Wichita, KS, J. Franklin Hummer, Med James, Inc., Shawnee Mission, KS, for Defendants.

### MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on the separate motion of each defendant for summary judgment. Plaintiff filed a single response addressing all four summary judgment motions. The City of Junction City ("City") and all defendants have replied. On that record, the court considers this matter fully briefed and ripe for determination. For the reasons set forth below, the court grants the motion of each defendant.

### I. Statement of Uncontroverted Facts

Plaintiff, Pete Arceo (hereinafter "Arceo"), brings three causes of action: 1) a violation of 42 U.S.C. § 1983 by malicious prosecution and false arrest/imprisonment; 2) a violation of state law by false arrest/imprisonment; and 3) a violation of state law by malicious prosecution. Specifically, paragraph 14 of Arceo's complaint states, in pertinent part: "The defendants Clark, Warren and Lueker conspired together to violate the civil rights of Arceo and to charge, imprison, and convict him of a crime which he did not commit and

which the defendants should have recognized he did not commit." With Arceo's claims as a backdrop, the court will set forth its findings of material fact. The court assumes that the parties made every effort to focus the pleadings in this case on the actual facts in controversy. Still, the record is extensive and frequently duplicitous. To draft a comprehensive and comprehensible order, the court sets out a single recitation of facts incorporating the positions of all parties. The court cites to the record only where necessary to clarify its findings as to facts allegedly in controversy.

The court's findings include facts taken from various defendants' grand jury testimony. Defendants object to the use of grand jury testimony as a basis for a summary judgment record. The court overrules those objections for the reasons set forth below.

### A. Structure of City, JCPD, and Geary County Attorney's Office

The City of Junction City is organized as a City of the First Class pursuant to K.S.A. § 12–1036b *et seq.* Pursuant to K.S.A. § 12–1014, such cities are overseen by a City Manager who is generally responsible for ensuring that the City's laws and ordinances are enforced. The statutes do not directly state whether the City Manager has the authority to instigate, facilitate, or terminate a police investigation. The parties dispute whether the City Manager or the Chief of Police has final authority as to investigatory decisions. The City Commission, which the public elects, appoints the City Manager. City's Employee Handbook, City's Memorandum in Support, Exhibit 54A, Bates No. 1227. The Employee Handbook states that the City Manager's responsibilities include the "exercise and control over all departments and divisions that may be created by the

City Commission." *Id.* at 1230. The Handbook further indicates that "[e]ach Department Head is responsible to the City Manager and the City Manager is, in turn, responsible to the City Commission for the efficient operation and maximum provision of service." *Id.*

Defendant Warren was the City's Chief of Police from October 7, 1996 through January 4, 2000. Warren testified that he was a department head, he was responsible to the City Manager, and the City Manager had the right to hire and fire him. Warren Deposition, City's Memorandum in Support, at 20. At Warren's deposition, he discussed section 1.3 of the City's Employee Handbook, which states:

> The [Handbook] shall not be construed as limiting the power and authority of any Department Head to make, or cause to be made, any rules and regulations governing the conduct and performance of department employees. Departmental rules and regulations shall not conflict with provisions of these rules and shall be approved by the City Manager. Such rules and regulations, when approved, published and distributed, shall have the force and effect of rules of the department and disciplinary action may be based upon breach of any such rules and regulations.

Employee Handbook, Exhibit 54A, Bates No. 1231. Section 1.4 of the Handbook provides that the City Manager is responsible for the "administration of these rules and regulations." *Id.* In considering these Handbook sections, Warren stated the following:

> Q: Did the city manager reserve the right, from time to time, to look into the operations and effectiveness of any rules and regulations that you promulgated for your department?
> A: Yes, sir, he did.
> Q: In other words, would you say, then, that the city manager—insofar as the operation of your department, the city manager was the final authority, he could review anything that was done within your department?
> A: That is correct.
> Q: All right. So in that sense, since he had that power of review, he was the final authority?
> A: That is correct.

Warren Deposition, at 23. Based on this deposition testimony, the City contends that "Warren did not have any control over investigations that was not subject to change, modification, or reversal by the [City Manager]." City's Reply, at 21, ¶ 8 (see also ¶ 5). On the other side, Arceo relies on the testimony of Jeffrey Clark who stated that Warren had the authority to terminate investigations. Clark Deposition II, Arceo's Response, at 238–239.

Clark's testimony on this topic is not highly persuasive, but the court nonetheless finds the City's position to be unsupported by the record. The City's Handbook, sections 1.3 and 1.4, clearly outlines the authority structure relative to promulgated rules and regulations, specifically, personnel rules and regulations. Warren, during his deposition, discussed the City Manager's authority to review, set aside, etc., such promulgated rules and regulations. Counsel then continued the questioning by discussing a broad or general "power of review" and the concept of "final authority." The context of the deposition, coupled with the text of the Handbook, reflects the logical premise that the City Manager could oversee the generation and application of personnel and policy rules and regulations. Now, the City argues that Warren's broad statements suggest that the City Manager likewise had the authority to terminate or otherwise control police investigations. The record instructs such a conclusion only if one takes Warren's deposition statements out of context.

The City's position may very well be accurate, but on the basis of the record before the court, the possessor of final authority over police investigations within the City's power structure is a matter in controversy. The court does find, however, that the City Manager has the final authority to review and set aside any promulgated policies and procedures which the Chief of Police might generate.

The Junction City Police Department ("JCPD"), at all relevant times, was divided into three sections: 1) uniformed patrol, including K–9 units and animal control; 2) administrative services; and 3) investigation, including detectives, the Drug Task Force, and laboratory services. The Chief of Police is responsible for all three divisions. Captain Winter and Lieutenant Royce Rasmussen supervised the investigation division and were the immediate supervisors of all JCPD detectives. When the investigation division receives a call for service, the call is assigned a case number and where investigation is necessary, it is also assigned a detective. The officer's observations generally govern further activity.

The JCPD handles an average load of 20,000 cases per year. The City is authorized to have 55 sworn officers, but during the relevant periods, the department's average size was 45–50 officers. Due to the size of the department and caseload, the Chief of Police does not know the details of every case. Chief Warren is certain, however, that the JCPD does not expressly or impliedly authorize or permit an arrest without probable cause.

Chief Warren attended and graduated from the Kansas Law Enforcement Training Center ("KLETC") at Hutchinson, Kansas, thereby becoming certified by the State of Kansas as a law enforcement officer. All of the officers, including defendant Jeff Clark were certified by KLETC or by other states which had reciprocal agreements with Kansas. All JCPD officers had training in probable cause analysis, arrest procedures, reports to prosecutors, and working with prosecutors.

As required by state law, the JCPD also has a specific policy ("Geary County Domestic Violence Policy") instructing officers on appropriate ways in which to deal with domestic violence situations. The JCPD regards domestic violence calls as dangerous investigations, with the danger extending to both responding officers and the parties involved. When a JCPD officer responds to a domestic violence call, the JCPD policy instructs the officer to listen to both sides of the dispute, to look for signs of abuse or physical damage to the surroundings, and to interview any witnesses who remained at the scene, including children and neighbors. The policy requires an arrest if probable cause exists based on information given by any single witness or a combination of several witnesses.

Police officers, through the division commander, forward investigations to the county or city attorney. The prosecutor then makes any prosecutorial decisions. Police officers do not make any decision as to which cases to prosecute. In this case, the Geary County Attorney's office made all relevant decisions pertaining to the prosecution of Arceo. That office refuses to prosecute approximately 20 percent of the reports it receives from the JCPD. Generally, the refusal to prosecute is due to insufficient evidence.

The Geary County Attorney's office also maintains a domestic violence policy. The office's domestic violence case load was such that one of the Geary County prosecutors, Thomas Alongi, was primarily responsible for such cases from late 1998 through March 2000. At all relevant times, Chris Biggs was the Geary County Attorney. Biggs handled the high profile

and homicide cases, while three assistants handled the other cases on a rotating basis. The office handles between 450–600 cases per year and up to 2,000 cases per year if traffic cases are included.

### B. Arceo/Lueker Connection and Events Giving Rise to Case No. 98–2050

The apparent impetus of the situation giving rise to this suit is a failed relationship between Arceo and defendant Suzanne Lueker. Lueker is currently a 23–year–old Kansas State University student. Arceo is a 30–year–old individual currently employed by the Central National Bank of Junction City as a file clerk. He is also a member of the Army Reserve. Lueker is not now and has never been an employee of the State of Kansas or any subdivision thereof. Arceo and Lueker entered a relationship in the fall of 1995 when Lueker was 17 years old and Arceo was 24. During the relationship, Lueker and Arceo lived together for approximately two years at a residence in Junction City. According to Arceo, the relationship officially ended on April 8, 1998, during a counseling session. Before the demise of their relationship, Arceo and Lueker had obtained a marriage license in anticipation of impending nuptials.

On February 16, 1998, Arceo and Lueker had an argument regarding the proper ownership of some personal property. The argument resulted in Arceo "spanking" Lueker in order to "put her in her place." Arceo Deposition, at 28. Arceo contends that Lueker initiated the physical contact, but fails to cite any portion of the record to support that contention. Arceo's Response to Lueker's Statement of Fact No. 12. The court has perused the relevant portions of Arceo's deposition and recognizes that a police officer asked him about some marks on his person. Arceo Deposition, at 33. However, this does not support a conclusion that Lueker initiated

the violence. At any rate, after the "spanking," Arceo left the residence and contacted Officer Nimmo of the JCPD to report the incident. Arceo acknowledged to the officer that he had struck Lueker. Nimmo and several other officers investigated the incident and arrested Arceo for battery.

On February 17, 1998, Arceo was charged in the Municipal Court of Junction City, Kansas, with "striking in the neck and face with his hand and fist Suzanne Lueker" in violation of section 220.150 of the Code of the City, i.e., battery. Complaint, Case No. 98–2050, Exhibit 4, City's Memorandum in Support. The action was initiated on the basis of an affidavit from Officer Nimmo. On the same day, Arceo pled guilty to the battery charge. On February 19, 1998, the municipal court fined Arceo $200 and sentenced him to sixty days confinement but granted him parole for a period of one year. During his period of parole, Arceo was not to contact Lueker in any manner and was to obtain counseling at his own expense with written verification to the court within ten days and with counseling to continue until released by the counselor with a final report to the court.

As noted above, on April 8, 1998, during the course of a court-ordered counseling session with counselor James Smith (a licensed LMSW), Arceo determined to terminate his relationship with Lueker. At some point subsequent to that time, Arceo noticed an affidavit from Lueker on his sergeant's desk at his reserve unit at Fort Riley. The affidavit described three incidents where Arceo had physical contact with Lueker, occurring on March 21, 1998, March 27, 1998, and April 3, 1998. Lueker drafted the affidavit on April 9, 1998 after a discussion with the City Attorney on April 8, 1998. All three of the incidents occurred at Arceo's residence after Lueker

had moved out. Arceo knew that Lueker retained a key to his residence and did not object to her visits. Arceo states that the Army "flagged" him, which means he could not obtain any career advancement, could not handle weapons, could not take part in combat training, and was restricted to the unit. Arceo could not testify, however, that the "flagging" was a direct result of the Lueker affidavit.

On April 22, 1998, the City Attorney issued to Arceo a notice to appear on a motion to revoke parole with a hearing date of May 7, 1998. The notice was based on Lueker's April 9, 1998 affidavit, indicating that Arceo had physically abused her on several occasions. On May 7, 1998, Arceo appeared with attorney Doug Thompson and the parole revocation hearing was reset for June 3, 1998. On June 3, the municipal court heard the motion, Arceo was found to have violated a term of his probation as set in Case No. 98–2050. The municipal court revoked his parole and committed Arceo to serve 60 days. Arceo served two days and was released on parole for a period of one year. Arceo was also fined and instructed to refrain from any further contact with Lueker.

### C. Development and Disposition of Case Nos. 98–821/98–829

On June 8, 1998, upon application by Lueker, the Geary County District Court entered a Temporary Order of Protection against Arceo with a hearing date of June 22, 1998 with the restraining order effective until that date. No further action appears to have been taken on the Temporary Order of Protection. Temporary Order of Protection, Exhibit 6, City's Memorandum in Support. *See also* Complaint, 98–CR–821, Exhibit 7, City's Memorandum in Support.

Instead, on June 22, 1998, the date the restraining order expired, County Attorney Biggs filed a criminal complaint against Arceo in the Geary County District Court, Case No. 98–CR–821, charging Arceo with criminal threats, violating the terms of a protective order, and aggravated intimidation of a witness. The complaint was based on a probable cause affidavit submitted by Officer Charles Leithoff, which set out that Arceo had threatened Lueker by phone and had "egged" her car. Specifically, Leithoff's affidavit described his conversation with Lueker wherein she asserted that Arceo had made a threatening phone call to her, stating among other things, "you better drop the restraining order against me or you will be a dead bitch." Jimmy Mullenaux, a friend of Lueker's, heard the phone call and relayed the information to Officer Leithoff. Mullenaux told Leithoff he recognized Arceo's voice because he had known Arceo for more than ten years. Arceo denied calling Lueker in regard to this incident. After being arrested, authorities released Arceo on a recognizance bond, the terms of which stated that Arceo was to refrain from any contact with Lueker. On July 21, 1998, the district court held a preliminary hearing in Case No. 98–821. Arceo waived preliminary examination and the court found probable cause to believe that Arceo had committed the charged offenses. Arceo was bound over for arraignment and trial. At this point, affidavits by both Lueker and Mullenaux supported the charges and Russell Roe was prosecuting the case.

On June 24, 1998, another criminal action was brought against Arceo in the Geary County District Court, Case No. 98–CR–829. The complaint reflected two charges: 1) violation of a protective order in violation of K.S.A. § 21–3843a(4) and 2) communication of a threat to commit violence with intent to terrorize another in violation of K.S.A. § 21–3419. An Officer Rains signed the probable cause affidavit in this case. He indicated that Lueker

told him that, while she was working at a country club, Arceo approached her in a vehicle, flipped her off, and stated "you're a dead bitch." Lueker provided Rains with a copy of the conditions of release on bond ordered by the district court on June 22, 1998 in Case No. 98–CR–821. Additionally, Lueker's statement was verified by her boss, Jennifer Stegmeier. Arceo was again released on a recognizance bond with a "no contact with victim" provision. Written order of the district court confirmed the bond order on June 30, 1998. Attorney Steven Opat represented Arceo in the case. At the same July 21, 1998 preliminary hearing as in Case No. 98–821, Arceo waived preliminary examination in this case (98–829) as well and the court made a finding of probable cause to believe Arceo committed the crimes of criminal threat and aggravated intimidation of a witness in 98–821 and criminal threat as charged in 98–829. As noted above, Arceo was bound over for arraignment and trial. It appears that the Geary County District Court had consolidated the cases (98–821 and 98–829) by this point. Prosecutor Roe was responsible for both cases.

In resolution of Case Nos. 98–821 and 98–829, Arceo entered a plea agreement on September 14, 1998. The terms of the agreement indicate that the state would dismiss with prejudice all charges that were or could have been raised in the course of Case No. 98–829 [1] if Arceo agreed to enter a plea on the charge of violating a protective order and on the charge of simple assault as charged in Case No. 98–821 (these charges were introduced by amendment through agreement—See Warren's Memorandum in Support, Exhibit N). Arceo entered a plea of *nolo contendere* on those charges and was thereby found guilty of a violation of a protective order, a class A misdemeanor,

and Class C assault, resulting in a 30–day sentence with a work release program. Additionally, Arceo agreed, as a condition of the plea and probation, to have no contact with Lueker. The conviction in Geary County District Court in Case No. 98–821 violated the terms of Arceo's parole entered by the Municipal Court of Junction City, Case No. 98–2050. Thus, Arceo agreed to serve 14 of the 58 days remaining on his parole. Warren's Memorandum in Support, Exhibit O. The time would be concurrent with his sentence in Case No. 98–821, and the jail time was set to commence on September 16, 1998.

## D. Incidents Triggering Investigation and Case No. 98–1424

On September 16, 1998, detective Clark was assigned to investigate complaints that Lueker had made to the JCPD regarding a September 15–16 incident involving Arceo. Prior to Clark's involvement in the investigation, Lueker had seen Clark on one or two occasions, but did not know him beyond recognition of his face. At approximately 1:00 a.m. on September 16, 1998, Lueker reported to the JCPD that someone had tampered with her vehicle, a Pontiac Grand–Am, while it was parked at her residence. Officer Loyce Smith responded and found writing on the inside of the vehicle's windshield, stating "It's not over I told you—you don't know what I can do to you Now your [sic] dead." The writing was in grease paint or a similar product which the officer believed to be military face camouflage. Smith found a military insignia sticker adhered to the outlet of the vehicle's exhaust pipe, and also found the vehicle's fuel tank cover open so that the filler tube was exposed. Smith could not determine whether anything had been placed into the fuel tank. Lueker told

---

**1.** In essence, the state agreed not to pursue additional charges against Arceo arising out

of actions that occurred prior to September 14, 1998, the date of the agreement.

Smith she had found a book of partially burnt matches resting on the opening to her vehicle's fuel tank before she called police, but that she had removed the matches before the police arrived.

Upon commencing an interview, Lueker told Smith that she believed Arceo was responsible for the threat, stickers, and matches. She described to Smith a long history of domestic violence involving herself and Arceo. She indicated that Arceo had just been sentenced to 30 days in jail as a result of domestic violence and that he was to begin the sentence later that day, on September 16, 1998. Lueker informed Smith that she locked her vehicle and that Arceo still had a set of keys to the vehicle. Smith noted that the perpetrator had not forced entry into the vehicle. Finally, Lueker told Smith that she believed the sticker on the exhaust pipe was an insignia from Arceo's reserve Army unit. Smith's report concluded by indicating his request that the case "be forwarded to the County Attorney's office for review." During her grand jury testimony, Lueker testified that, at the time Smith was conducting the interview, she knew the handwriting on the windshield did not resemble Arceo's, but did not mention this to the police. Lueker also told officer Smith that she wanted her civil attorney to see the windshield as it would constitute a violation of an existing Protection From Abuse ("PFA") order. Officer Smith indicated his understanding, however, that Lueker wanted to discuss the September 15–16 incident with her civil attorney before making a statement to police. On the same day, Lueker's attorney called the Central National Bank to give a representative of the bank an opportunity to view the alleged vandalism.

Later, in the afternoon of the 16th, detective Clark took Lueker's sworn statement. Lueker confirmed that the vehicle was locked and in normal condition at 10:00 p.m. on September 15, 1998. She next saw the vehicle around 1:00 a.m. on the 16th, at which time the tampering was complete. Lueker additionally told Clark that Arceo had previously threatened her over the phone using language similar to that found on the windshield. After interviewing Lueker, Clark reviewed other police reports pertaining to Lueker. He found that Lueker had complained about harassment and threats by Arceo on other occasions. Clark made note of the following reports in his first investigative report:

1) Case 98–7772, Telephone Harassment; Lueker received a phone call on her cellular phone stating, "you better watch out." Arceo then called, saying "You're not home yet."

2) Case 98–7821, Criminal Threats and Telephone Harassment; Lueker received a call from an unknown male saying, "hope you don't have a drowning" and then received a call from another unknown male saying, "hope you don't have any problems at the pool." When Lueker asked what the caller wanted, the caller stated, "you're going to be a dead bitch."

3) Case 98–8574, Aggravated Intimidation of Witness, Criminal Threats, and Violation of a PFA; these incidents involve Arceo calling Lueker and telling her to drop a restraining order or she would be a "dead bitch" and the "egging" of Lueker's vehicle.

4) Case 98–8675, Violation of PFA and Criminal Threats; Arceo drove to Arceo's work place and threatened her stating, "you're a dead bitch." This incident was witnessed by Lueker's boss, Jennifer Stegmeier.

5) Case 98–8875, Telephone Harassment; Martha Rombold, wife of Lueker's civil attorney, received a harassing phone call from a person she believed to be Arceo.

6) Case 98–11230, Defamation; Kyle Junghaus, Arceo's friend, was upset by rumors that he was making death threats to Lueker.
7) Case 98–11546, Criminal Threats; an unknown caller told Lueker that Arceo was planning to harm her and even talked of drowning her.
8) Case 98–13506, Telephone Harassment; Lueker alleged receiving a harassing call to her home. Her "caller I.D." indicated the call was placed from Arceo's place of employment.[2]

Clark continued investigating and preparing reports through October 21, 1998. At that time, his supervisor, Captain Winters, reviewed and approved his completed reports and then forwarded them, along with any sworn statements or affidavits, to the Geary County Attorney's office. Prosecutor Russell Roe asked Clark to prepare an affidavit which could be used to request an arrest warrant to arrest Arceo for the acts described in Clark's investigation. Clark prepared the affidavit and executed it on October 21, 1998. The affidavit essentially summarizes Clark's investigative reports up to that date.

### E. Clark's Investigation Leading to Case No. 98–1424

During the investigation leading up to the 98–1424 charges, Larry Pacquette, the vice-president of Central National Bank, came to Chief Warren's office to state his opinion that Arceo was innocent of the charges against him. Pacquette told Warren he believed that two JCPD officers, Loyce Smith and Ron Shelton, were having an affair with Lueker, and that the affairs had affected their treatment of certain complaints by her. Pacquette did not provide Warren with any evidence to support his assertion. Warren then offered to allow Arceo to take a Computer Voice Stress Analyzer ("CVSA") test. Arceo did take the CVSA test on September 23, 1998, during which the interrogator asked him whether he had vandalized Lueker's vehicle or knew who did such acts. The administrator of the test reported to Warren that the test revealed Arceo had shown signs of deception on the relevant questions. Similarly, on November 19, 1998, after the 98–1424 complaint, Arceo underwent a polygraph examination administered by the KBI in which he answered several questions about the vandalism of Lueker's vehicle. The KBI report indicates that "[Arceo] was being deceptive when answering the relevant questions." Warren Memorandum in Support, Exhibit U.

After the conversation with Larry Pacquette, Warren relayed the information to Clark and conveyed the names of several individuals for possible questioning. From that point on, Clark kept Warren informed with regard to the investigation in Lueker's complaint, but Clark's supervisor and the person who reviewed his reports remained Captain Winters. Clark did interview the individuals mentioned by Warren and referred the results to Captain Winters. Clark testified that Captain Winters and Chief Warren agreed that Clark should conduct surveillance of Lueker. Clark began conducting the surveillance a week or two after the reported vehicle vandalism, but the effort did not lead to any additional evidence. Lueker stated that she was not initially aware that Warren and Winters ordered Clark to surveil her residence, but that Clark eventually informed her of the fact. Clark testified

---

**2.** During his investigation, Clark spoke with a Larry Plagerman, an employee at Central National Bank, who indicated that he had called Lueker's phone number during some collection activity. Clark recognized that this fact could explain Lueker's purported evidence of phone harassment originating from Arceo's workplace.

that he spent "quite a bit" of overtime on the investigation of Lueker's complaint. Roe was not aware of the details of Clark's investigation, but testified that Clark's working overtime would not have concerned him. Warren also testified that he was not aware of Clark's overtime because the investigator's immediate supervisor usually handled and approved such matters.

During his second deposition, taken on September 20, 2001, Clark testified extensively regarding the content of the October 21, 1998 affidavit. He stated that all of the criminal conduct alleged in his affidavit occurred after September 14, 1998[3]. However, he also provided information relating to pre-September 14 conduct to the prosecutor for use in determining appropriate charges. Specifically, Clark felt the earlier activity would be relevant to determining if the prosecutor should advance a stalking charge. However, Clark did state that he was not aware of any post-September 14 evidence which would support a stalking charge. Nonetheless, Clark stated that the information was forwarded without his knowledge of the plea agreement and simply for the purpose of allowing the County Attorney to assess the situation.

As it pertains to the vehicle vandalism/attempted arson, Clark indicated that the evidence against Arceo was based on Lueker's statement and other circumstantial evidence. Clearly, Lueker did not see Arceo committing the alleged acts. As noted above, Clark had discovered evidence to explain the phone call from Arceo's place of employment. Further, Clark indicated that Lueker's claims in regard to an incident occurring in South Park, which will be discussed below, were somewhat suspicious. In short, after investigating Lueker's report, Clark could not determine that, after September 14, 1998, Arceo had violated a PFA, had used a telephone to harass any person, or had threatened Lueker.[4]

### F. The Filing of Case No. 98–1424

Prosecutor Roe filed, on behalf of the State of Kansas, a Complaint/Information against Arceo, dated October 21, 1998[5], in the Geary County District Court, Case No. 98–CR–1424. The complaint was based solely on detective Clark's affidavit. The complaint included five counts. Counts 1 and 5 allege that Arceo attempted to damage Lueker's Pontiac Grand–Am by means of fire or explosive, resulting in charges of attempted arson and felony criminal damage to property. Counts 2 through 4 include stalking, criminal threat, and attempting to dissuade a victim from making a victimization report. Roe prepared an arrest warrant and attached evidence of probable cause and presented the package to the Honorable Larry Bengston, Judge of the Geary County District Court. Judge Bengston found probable cause for all five charges and signed the arrest warrant on October 22, 1998.

At the time of filing the 98–1424 complaint, Roe was fully aware of the disposition of Case Nos. 98–821 and 98–829, as well as all of the facts and affidavits lead-

---

3. The September 14, 1998 date is important because Arceo entered the plea agreement in Case Nos. 98–821/829 which discharged his criminal liability on acts committed prior to the date of the agreement in return for Arceo's guilty plea.

4. The court notes that this statement must be considered in accordance with Clark's testimony that he was, at the time of his investigation and report to the County Attorney's office, unaware of the September 14, 1998 plea agreement. The analysis leading to Clark's determination occurred after the fact.

5. The complaint was drafted on October 21, 1998, but was not actually filed until October 23, 1998.

ing to the plea agreement. Additionally, Roe was aware of the municipal court record in Case No. 98–2050. Before filing the complaint in Case No. 98–1424, Roe considered a number of facts. Primarily, Roe relied on the following:

1) The affidavit of Karen Pruitt which states that she had previously been in an abusive relationship with Arceo.

2) The April 9, 1998 affidavit by Lueker outlining the three occasions of physical abuse by Arceo (3/21/98, 3/27/98, and 4/3/98).

3) A PFA order which prohibited Arceo from contacting Lueker in any manner.

4) An affidavit prepared by Officer Leithoff outlining the facts giving probable cause to believe Arceo had committed aggravated intimidation of a witness, criminal threat, and a violation of a protective order.

5) A June 21, 1998 statement by Lueker outlining a phone call from Arceo in which he threatened her if she did not drop the restraining order.

6) The affidavit of Jimmy Mullenaux indicating that he had heard the June 21 phone threat and recognized Arceo's voice because he had been friends with him for many years.

7) Documents outlining the history and disposition of Case Nos. 98–821/829.

8) The municipal court order wherein Arceo plead guilty to the February 1998 battery of Lueker.

9) The affidavit of officer Loyce Smith regarding the September 15–16, 1998 incident involving Lueker's vehicle.

10) The offense report and probable cause affidavit prepared by detective Clark in reference to Case No. 98–1424, including the list of other occasions involving Lueker and Arceo and the results of Arceo's CVSA test.

11) The sworn statement of Lueker describing the automobile incident.

12) Lueker's statement dated June 22, 1998 regarding a phone log she kept from May 26, 1998 through June 20, 1998 outlining calls from either Arceo or his friends.

13) An October 13, 1998 affidavit by Lueker describing an alleged October 10, 1998 incident where Lueker claims to have been attacked and threatened by a masked assailant with a gun with the threats pertaining to the action against Arceo.

14) A Lueker affidavit describing the September 15, 1998 phone call which her "caller I.D." indicated to be from Arceo's work place, Central National Bank.

15) An affidavit by Jane Lueker, Suzanne's mother, explaining why the damage done to Lueker's vehicle could not have been done by Lueker.

16) Copies of the evidence log of photographs and items taken in connection with the September 15–16 vehicle incident, including a tape from Arceo to Lueker which was allegedly left in the vehicle and which led Roe to believe that Arceo was "nuts."

17) Detective Clark's continuing investigative narrative indicating that someone had called his wife from jail and claimed to be Arceo, but that Arceo had denied placing the call.

18) Clark's continuing investigative report describing an "on-going saga" and summarizing eight additional instances of threats.

19) A two-page investigation summary covering much of the above informa-

tion and indicating that Arceo had failed the CVSA test.

20) The results of the CVSA test indicating that the test had been administered by a qualified operator and that Arceo had been evasive on relevant questions.

21) A 13 page report from Clark detailing his questioning of a number of witnesses.

22) The cover sheet of a Kansas Standard Offense Report detailing Arceo's arrest.

Roe stated that it is the County Attorney's office which determines whether to prosecute a case, but that the determination rests heavily on information provided by police. While Lueker was the complaining witness in all of the cases against Arceo, she did not make any of the prosecutorial decisions. Lueker testified that she was not always pleased with the County Attorney's decisions in regard to prosecuting Arceo. Roe indicated that, in Arceo's case, he reviewed all documentation before filing Case No. 98–1424 because he wanted to make sure he had a "lock tight case," especially in view of the prior intervention by Central National Bank officials. Roe did discuss the case with Clark both before and after its filing, but never discussed the case directly with Chief Warren.

### G. Clark/Lueker Connection and Alleged Impact on Investigation

Rheanna Shaw is a former friend of Lueker. The two had known each other since childhood. Shaw stated, in her grand jury testimony, that Lueker had told her on a number of occasions that she wanted Arceo to go to jail and to lose his job at Central National Bank. Shaw further stated that Lueker had a box of Arceo's Army reserve unit items, including camouflage paint and unit stickers. Shaw also indicated that, on occasion, Lueker would call her own home from pay phones to make detective Clark believe that Arceo was stalking her. According to Shaw, Lueker staged a phone harassment incident with the assistance of Jimmy Mullenaux, who developed an interest in Lueker during Arceo's absence during military duty in Bosnia. Without going into further detail at this point, it is sufficient to state that prior to a phone call from Shaw in December of 1998, Clark did not have any information which would lead one to believe that Lueker was lying. *See* City's Statement of Fact No. 73 and Arceo's Admission Thereto.

Lueker also told Shaw that she and detective Clark had kissed for the first time on October 10, 1998, the night of the South Park incident.[6] Shaw stated that she had ridden with Clark and Lueker several times (Shaw's grand jury testimony reflected three to five times while Clark testified that it was perhaps twice), heard them discuss personal topics, and saw them touch each other's arms, legs, and shoulders. Clark did testify, during his grand jury testimony, that he gave Lueker a ride to and from the police station "no more than ten times" and that Lueker was with him perhaps three times while he was on surveillance (such as while he was surveilling Mr. Pacquette's residence). Clark Grand Jury, at 867. According to Shaw's testimony, Lueker called Clark her "undercover lover," and told Shaw that she had Clark wrapped around her little finger. Throughout Shaw's grand jury testimony, she recounts other examples which

---

**6.** Lucker told Clark, the only responding officer, that she had been attacked by a masked assailant. Clark did not take any photographs or otherwise attempt to search for the assailant. He did retrieve Lueker's broken cell phone and some broken pieces of glass. Lueker indicated the assailant was the size and build of Mr. Pacquette.

tend to indicate that Clark had an interest in Lueker that was other than professional. Shaw and Lueker terminated their friendship in early December 1998. On the night the friendship ended, Clark called Shaw and told her to stop running her mouth and to leave Lueker alone. It was during this call that Shaw conveyed to Clark, for the first time, that Lueker had asked her to lie about the South Park incident. According to Shaw, she told Clark that she and Lueker were to meet in the park that night, when in fact they planned no such meeting. Thus, during the December 1998 phone call, Shaw told Clark that both she and Lueker had lied about the incident.

Clark testified that he never had any romantic relationship with Lueker. Arceo cites Clark's Grand Jury Testimony, pp. 870–71, 874–75, 878–89, for the proposition that Clark had "become involved with Lueker." The cited portions of the record do not support any conclusion that Clark was romantically involved with Lueker. Clark did indicate that there were some problems with Lueker calling him directly or paging him to report incidents, but stated that the repeated calls were annoying and he eventually addressed Lueker about the situation. Lieutenant Rasmussen confronted Clark about receiving all the direct calls and the amount of time he was spending on Lueker's complaint. While he did address the situation, Clark had given Lueker a police department cell phone and told her to contact him directly if she had any problems or if she were going to leave her residence at night. After Clark confronted Lueker, he stopped returning her pages and stopped receiving her phone calls. Clark additionally testified that, after the September 15–16 vehicle incident, he gave Lueker a hug and told her to "hang in there." Clark specifically denied kissing, having intercourse or any other sexual or physical contact with Lueker. Clark further states that he never fur-

nished any information to the County Attorney's office which he knew to be false and that he never knowingly concealed any material fact concerning Lueker's complaints. Finally, Clark testified that he and Lueker had never discussed or planned to have Arceo wrongly arrested, imprisoned, or prosecuted.

James Connor, a former police officer, now works as an investigator for Clarence Kelley & Associates ("Kelley"). He was hired by Kay Huff, Arceo's criminal defense attorney in Case No. 98–1424 and later in 99–764. Huff initially hired Connor on December 31, 1998 to investigate the facts relevant to the case against Arceo. After his investigation, Connor concluded that detective Clark should have known that Lueker was lying on certain occasions. Connor apparently based this conclusion on the conversation that Clark had with Rheanna Shaw regarding the South Park incident.

At some point after the October 22, 1998 arrest and subsequent to the filing of Case No. 98–1424, Clark became aware that a Geary County Sheriff's Lieutenant, Beth Gilmore–Jones, was conducting an internal affairs investigation about a contact a jailor made with Arceo. Gilmore–Jones told Clark that he should talk to jailor Lisa Villa because Villa might have information relating to Clark's investigation of Arceo. Clark prepared a report of his conversation with Villa which stated:

> Lizza also mentioned that one time Suzzane did want her and Crystal to go by Petes [sic] house to see if he was home and made a phone call from his residence to hers but that never occurred and she never thought much more about it.

The report further discussed how Lueker allegedly told the individuals to pretend they needed help because their vehicle had broken down in order to use Arceo's

phone. The purpose of the alleged ruse was to enable Lueker's "caller I.D." to reflect a call from Arceo's residence and thereby evidence Arceo's violation of his conditions of probation. Clark supplied this report to the prosecutor's office in early November 1998. However, Roe testified that Clark's description of events was so innocuous that it did not cause him to think that Lueker was lying. The Villa allegation first came to Clark's attention after he had executed the October 21, 1998 affidavit that served as the basis for the complaint in Case No. 98–1424. Neither Roe nor Clark saw the report prepared by Gillmore–Jones that discussed Lueker's alleged attempt to manufacture evidence until well after the events of this case. Having read the report before his deposition, Roe testified that he would have still believed that probable cause existed to arrest Arceo, but he would have been much more interested in Lisa Villa's statements. Specifically, the report would have made him question whether Lueker was telling the truth. Clark did question Lucker about Villa's accusation and Lueker denied any involvement.

### H. Arceo's Arrest and the Prosecution of Case No. 98–1424

Picking up the thread of the formal prosecution, Judge Bengsten signed an arrest warrant naming Arceo. The arrest warrant was executed on October 22, 1998 by two plain clothes officers, Clark and another officer, who arrived in an unmarked vehicle at Arceo's place of employment, Central National Bank. Warren testified that, especially in cases of domestic violence, it is JCPD policy to execute the warrant as soon as possible so as to alleviate risk of further harm to the victim. Warren Deposition, at 54–56. There is factual controversy as to whether the officers arrested and handcuffed Arceo before or after he exited the bank building, or even whether they handcuffed him at all.

At the first hearing following Arceo's arrest, on October 23, 1998, the district court assigned Arceo counsel, Maritza Segarra. The prosecution offered to reduce Arceo's bond to $10,000 if Arceo's employer, or an individual officer of the bank, was willing to accept liability on the bond. During the period immediately following the hearing, no request for reduction of the bond was made by or on behalf of Arceo.

In mid-March 1999, Tom Alongi, Assistant County Attorney, took over the case from Roe due to Roe's being extensively involved in a separate impending homicide trial. Roe's involvement in the case ended at this point. When Alongi became involved in Arceo's case, he was unaware of the ongoing internal sheriff's department investigation. In fact, he did not receive a copy of Gilmore–Jones's report regarding the investigation until well after he dismissed the 98–1424 charges. However, Alongi did know that Lisa Villa had stated that Lueker had asked her and another individual to plant false evidence in the form of a phone call from Arceo's house to Lueker's. Alongi was aware of the accusation but did not believe that Villa's statement affected the appropriateness of the charges against Arceo since the evidence reflected in the charges was not tainted by virtue of the statement and because the allegation did not outweigh other corroborating evidence of Arceo's commission of the acts alleged in the case. Alongi further noted that, in talking with Lueker, she did not "come off vindictive, like I've got him." Alongi Deposition, at 97, Lueker's Memorandum in Support, Exhibit N.

At a hearing on December 10, 1998, Arceo waived preliminary examination through his appointed counsel. The court found probable cause and bound him over for trial. Alongi filed an Amended Information on March 23, 1999 that included an

additional three events, or physical contacts, which Lueker had described in her April 9, 1998 affidavit, i.e., that Arceo made physical contact with her on March 21, 27 and April 3 of 1998. To be clear, the Amended Information in Case No. 98–1424 contained the following charges: 1) domestic battery arising from an alleged March 21, 1998 incident; 2) domestic battery arising from an alleged March 27, 1998 incident; 3) domestic battery arising from an alleged April 3, 1998 incident; 4) solicitation to commit perjury arising from an alleged incident in late May 1998; 5) telephone harassment arising from an alleged June 5, 1998 incident; 6) telephone harassment arising from an alleged June 7, 1998 incident; 7) making a criminal threat arising from an alleged June 7, 1998 incident; 8) attempted arson arising from an alleged September 16, 1998 incident; and 9) stalking arising from alleged incidents between June and October 1998.

Notwithstanding Arceo's prior waiver of his preliminary examination, the court held another preliminary examination on March 31, 1999. The prosecution produced witnesses Lueker and Loyce Smith, who testified about his investigation of the vehicle incident. The government did not call detective Clark, and the defense did not proffer any evidence. The court found probable cause to bind Arceo over on the charges of attempted arson, stalking, and criminal threat. On that same day, Robert Munson of the Central National Bank, signed as surety in the sum of $10,000; Arceo then signed a recognizance bond and was released from custody pending trial. Alongi filed a Second Amended Information on April 5, 1999 basically setting forth the charges that survived the March 31, 1999 preliminary hearing.

Alongi testified that, as of the filing of the Amended Information outlined above, he had no doubt as to the existence of probable cause on all charges contained

therein. Similarly, the original prosecutor, Roe, testified that he would have filed the original charges in Case No. 98–1424 even if he had known about additional circumstances that subsequently came to light. Roe further stated that the totality of the circumstances led him to believe that Arceo was the type of person who would harm Lueker.

On June 21, 1999, in response to Arceo's motion to enforce the September 14, 1998 plea agreement entered in resolution of Case Nos. 98–821*829, the district court eliminated many of the counts in the Second Amended Information as having been extinguished by the agreement, which prohibited prosecution for all matters that were or could have been filed prior to September 14, 1998. Thus the remaining claims, after the June 21 order, were the counts involving attempted arson of the Grand–Am and the criminal threats written inside the vehicle which occurred on September 16, 1998, and the stalking charge which was predicated at least in part on events after the critical date.

Certain facts presented by the City (Fact Nos. 93–106) and Lueker (Fact Nos. 55–57) address the April 12, 1999 and June 7, 1999 arrests of Arceo and the ensuing prosecution in Case No. 99–CR–764. At footnote 4 of his response brief, Arceo plainly states that he does not assert a cause of action based on these 1999 incidents. However, the additional arrests are relevant to Arceo's attempt to show that Lueker conspired with the police to violate Arceo's constitutional rights, thus subjecting her to section 1983 liability. In addition, the court notes that defendant Lueker has introduced facts relating to a civil suit (Geary County District Court Case No. 99–C–42) filed by her against Arceo based primarily on occurrences discussed herein. Neither of these cases are immediately relevant and the court will

thus omit discussion of Case Nos. 99–CR–764 and 99–C–42 until the appropriate analysis section. At this point, it is sufficient to recognize that the district court joined Case No. 99–764 with Case No. 98–1424 and the cases proceeded simultaneously.

The County Attorney's office continued to investigate the case, and on July 29, 1999, Alongi requested a continuance, citing the need to examine some newly discovered scientific evidence being offered by Arceo. The court denied the continuance. On July 30, 1999, Alongi met with Lueker to discuss some evidence. Lueker provided some phone records which dealt with an April 19, 1999 incident. She also indicated that she had some evidence that Arceo had lied under oath during a prior proceeding. Alongi wanted additional time to consider this evidence and accusation and thus elected to dismiss the case without prejudice. On August 2, 1999, the district court dismissed the case against Arceo without prejudice.

## I. Events Following Dismissal of Case No. 98–1424

Up until August of 1999, the City Manager's office had no reason to suspect that the activity of detective Clark or any other officer fell below professional standards. However, beginning in August 1999, the Junction City newspaper, the Daily Union, carried articles and Letters to the Editor, authored by officials of the Central National Bank, critical of the JCPD's handling of the investigations involving Arceo. On October 4, 1999, each City Commissioner and the City Manager received a letter from Bruce Woner, an attorney in Topeka, Kansas. The letter included a number of attachments and essentially sought to establish that detective Clark, Chief Warren and others had violated Arceo's constitutional rights in the way they dealt with the investigation of Lueker's claims. Woner's letter also included a copy of a federal court complaint that was being prepared for filing if the City failed to take appropriate actions to remedy the alleged wrongs. After examining the evidence provided by Woner, the City hired a professional investigation group, Professional Services, Inc. ("PSI") to investigate Woner's allegations. The City did not receive PSI's report until December 7, 1999, but Clark was placed on administrative leave with pay on October 7, 1999.

In the interim, the prosecutor convened a grand jury which, on December 13, 1999, indicted detective Clark on charges of perjury and providing false information. On December 14, 1999, the City Manager terminated Clark in accordance with a recommendation from the JCPD because he had lied to the department during an internal investigation into Arceo's case. Clark believed he was terminated due to allegations that he had engaged in an affair with Lueker. The independent investigation, which PSI finalized on December 14, 1999, also included a recommendation to terminate Chief Warren. The City did in fact terminate Warren, effective January 4, 2000.

## II. Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents,*

991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the non-moving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis and Discussion

### A. Prefatory Objections

■ Initially, the court notes that several of the defendants object to Arceo's use of grand jury testimony of various defendants to establish a record for summary judgment. Defendants rely on the arguments raised in the City's reply brief. Indeed, Arceo makes numerous and extensive reference to the grand jury testimony of Jeff Clark, Suzanne Lueker, Rheanna Shaw, and John Warren. Rule 56 indicates that the court should decide a summary judgment motion based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed.R.Civ.P. 56(c). However, as previously noted in this district, "the particular forms of evidence mentioned in [Rule 56] are not the exclusive means of presenting evidence on a [summary judgment] motion. The court may consider any material that would be admissible or usable at trial." *Wright v. Wyandotte County Sheriff's Dept.*, 963 F.Supp. 1029, 1035 (D.Kan.1997) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 (1983)). The issue, then, is whether the grand jury testimony advanced by Arceo falls into the category of "any material that would be admissible or usable at trial."

Incidentally, the City argues that grand jury testimony is improper evidence in a summary judgment proceeding because none of the parties had an opportunity to cross-examine the witnesses. However, defendants are in the same position they would have been had Arceo filed an affidavit signed by the witnesses. Since defendants would not have had the opportunity to cross-examine an affiant, their inability to cross-examine the various witnesses during their sworn grand jury testimony does not result in prejudice. The remainder of defendants' arguments goes to the admissibility of grand jury testimony.

■ The court finds Judge Crow's opinion in *Duffee By and Through Thornton v. Murray Ohio Mfg. Co.*, 160 F.R.D. 602 (D.Kan.1995) to be persuasive on this issue. In that case, the court considered a statement given by a party to Arceo's counsel's interrogator. The person giving the statement was duly sworn to tell the truth by a shorthand reporter, and the reporter properly transcribed the questions and answers. The reporter signed the transcript, but the witness did not. Because a certified reporter prepared the transcript and because the witness gave the statement under oath, the court found that the transcript was at least as reliable as an affidavit. *Id.*

*Duffee* relied extensively on the Ninth Circuit case of *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323–24 (9th Cir.1991) where the circuit held that the trial court properly considered an unsigned transcript of a witness's statement given under oath. The circuit indicated that "because there is no reason to believe that the sworn answers to questions are less reliable than an affidavit, ..., that testimony should be admissible on summary judgment." *Id.* at 324. The court concludes that grand jury testimony, like the sworn and properly recorded statements mentioned in the cases above, is a reliable source of information which may be considered on summary judgment.

■ Defendants make much of the fact that grand jury testimony transcripts are not themselves admissible evidence. Given the above standards, it seems this is a critical consideration. However, defendants posit the wrong query. The proper question is not whether the actual transcripts fall within the gambit of proper evidence; the proper inquiry is whether the contents of the transcripts represent admissible testimony. As the Tenth Circuit notes in *Thomas v. International Business Machines*, 48 F.3d 478 (10th Cir. 1995), "the nonmoving party need not produce evidence 'in a *form* that would be admissible at trial,' but the content or substance of the evidence must be admissible." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)) (emphasis in original). As an example, an affidavit is not itself admissible at trial. It is, however, a proper basis for a summary judgment record if its content is admissible. In other words, a party may not include hearsay testimony that would be inadmissible at trial in an affidavit to defeat summary judgment. In the present case, the fact that the grand jury transcripts are not admissible at trial is irrelevant since much of the transcripts' content presents admissible and reliable testimony. Portions of the grand jury transcripts do contain inadmissible hearsay which the court will not consider. The court thus overrules defendants' objection to Arceo's use of grand jury transcripts but fully recognizes its duty to screen such evidence for any inadmissible content.

■ Various defendants also object to Arceo's inclusion of a statement of additional uncontroverted facts in his responsive pleading. Defendant City cites cases such as *Money v. Great Bend Packing*, 783 F.Supp. 563 (D.Kan.1992) and *Berry v. City of Phillipsburg*, 796 F.Supp. 1400 (D.Kan.1992), to support defendants' arguments that Arceo failed to properly respond to the various motions for summary judgment. These cases, and others like them, simply hold that a nonmoving party must specifically respond to the moving parties' statements of uncontroverted fact. Arceo complied with this requirement by separately responding to each allegation by each defendant. Arceo then went further by submitting a statement of additional facts. Rule 56 clearly contemplates such a statement of additional facts and contemplates an opportunity for the moving party to respond thereto. The court will consider Arceo's statement of additional facts and defendants' responses thereto. The court also notes defendants' objections to certain instances where Arceo attempted to controvert a fact, but failed to provide a proper citation. The court need not address that objection other than to make clear that it will not consider any assertion or response to be accurate unless and until the assertion or response is confirmed through use of proper summary judgment evidence. Where any party fails to properly cite the summary judgment record in response to a statement of uncontroverted fact, the court deems the factual assertion admitted.

### B. Defendant Lueker's Motion

To address Lueker's arguments, the court must set out a few additional facts. As noted briefly above, on February 8, 1999, Lueker filed a civil petition against Arceo in Geary County District Court Case No. 99–C–42. The petition included four counts: 1) intentional infliction of emotional distress; 2) tort of outrage; 3) assault; and 4) battery. Lueker's petition reflected allegations from occurrences from February through September of 1998, including the incident involving the threat on and damage to her vehicle. On February 23, 1999, Arceo filed a pleading in Case No. 99–C–42 entitled "Answer and Counter–Claim to Petition." The pleading denied the allegations in Lueker's pleading but did not include any counterclaim. On September 14, 1999, Arceo filed a Motion to Amend Answer to Add Counter–Claim. The amendment sought to add counterclaims for malicious prosecution or abuse of process and libel and slander. The proposed counterclaim alleged that Lueker made statements to the police leading to Arceo's arrests in connection with Case Nos. 98–1424 and 99–724 that she knew to be false and malicious. Civil Case No. 99–C–42 was transferred to the Montgomery County District Court. To this date, Case No. 99–C–42 has not been resolved and is still pending in state court. Arceo asserts that the state court stayed the case as a result of Lueker's decision to assert her Fifth Amendment privilege in the case, but he provides absolutely no evidentiary support for his allegation. In fact, the motion to amend filed by Arceo suggests that it was Arceo's assertion of privilege which had hampered the progression of Case No. 99–C–42 at least until the time of Arceo's filing of that pleading. Thus, on the record before the court, Case No. 99–C–42 remains pending and unresolved.

In the statement of uncontroverted facts, the court briefly mentioned Arceo's April 12, 1999 and June 7, 1999 arrests. The court will describe those incidents here as they pertain to Lueker's arguments. On April 12, 1999, Arceo was arrested after failing to keep an appointment with his Community Corrections officer, Chris McLeod. The appointments were a condition of his recognizance bond in Case No. 98–1424. The arrest followed the issuance of an arrest warrant based on the affidavit of McLeod. Arceo spent one night in jail.

On June 7, 1999, Alongi filed a complaint in Case No. 99–764 based on an alleged April 19, 1999 call from Arceo to Lueker in violation of numerous orders to avoid such contact. Alongi received evidence in the form of a cassette tape recording from Lueker's answering machine of Arceo's alleged call. Officer Loyce Smith heard the recording and identified the voice of as that of Arceo. Alongi, before filing Case No. 99–764, also considered statements from Arceo's stepfather and mother, the Weirs, which appeared to provide Arceo with a partial alibi at the time of the phone call on April 19, 1999. Alongi received phone records from the Weir residence which tended to verify that a phone call had been placed to Heather Fultz, a friend of Arceo's, at approximately the same time Lueker's machine received the alleged call from a pay phone in Milford Lake State Park. Alongi did not consider the alibi to be dispositive and proceeded with the filing of Case No. 99–764. Arceo's defense counsel later produced a report suggesting that the audiotape was a false representation of Arceo's voice. As noted above, Case No. 99–764 was joined with Case No. 98–1424, both of which Alongi dismissed without prejudice.

### 1. Subject Matter Jurisdiction Over Claims Against Lueker

Defendant Lueker argues that the court should remand Arceo's claims against her

to state court in view of the fact that Arceo's claims are already addressed in an allegedly compulsory counterclaim in Lueker's civil action, Case No. 99–C–42. Specifically, Lueker maintains that the court does not have subject matter jurisdiction over Arceo's claims against her because the present claims were compulsory counterclaims in Lueker's state court civil case and that Arceo's alleged failure to bring them in the civil case requires that they be barred pursuant to K.S.A. § 60–213(a).

K.S.A. § 60–213(a), which defines a compulsory counterclaim, is almost identical to Fed.R.Civ.P. 13(a). It generally requires a pleading to state as a counterclaim "any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." K.S.A. § 60–213(a) makes two exceptions to this general rule, but neither applies in this case. Under Kansas law, the essential test of a mandatory counterclaim is whether the counterclaim arises out of the same transaction. *Loving v. Federal Land Bank of Wichita*, 244 Kan. 96, 99, 766 P.2d 802, 804–805 (Kan.1988). While K.S.A. § 60–213 does not explicitly provide that failure to plead a compulsory counterclaim precludes the pleader from asserting it in a subsequent action, the Kansas courts have consistently applied the statute in that fashion. *See Loving*, 244 Kan. at 99, 766 P.2d at 804. State law governs the preclusive effect of failure to raise a compulsory counterclaim in an earlier state court action. *Glasgow v. Eagle Pacific Insurance Co.*, 45 F.3d 1401 (10th Cir.1995).

Lueker concedes that Arceo could not have brought a malicious prosecution counterclaim at the time he filed his initial answer on February 23, 1999 because Alongi had not yet dismissed Case No. 98–

1424 (dismissal of the underlying prosecution is a prerequisite to a successful malicious prosecution claim). After Alongi dismissed the underlying criminal case, Arceo moved to file a malicious prosecution counterclaim in the civil case. The court concludes that Arceo's actions in the civil case do not hamper his ability to bring a malicious prosecution action herein. *See Arch Mineral Corp. v. Lujan*, 911 F.2d 408, 412 (10th Cir.1990) ("[w]here a defendant acquires a claim after his answer has been filed it is not a compulsory counterclaim even if it arises out of the same transaction"). Lueker contends that the same prerequisite of dismissal of the underlying criminal case does not apply to Arceo's false arrest/imprisonment claim and that Arceo should have brought this counterclaim in his February 23, 1999 answer in order to avoid the preclusive effect of K.S.A. § 60–213(a).

The court need not decide whether Arceo's false arrest/imprisonment claim was a compulsory counterclaim in the civil case at the time of the filing of Arceo's initial answer. Lueker's argument is governed by the court's prior decision in *Raytheon Aircraft Credit Corp. v. Pal Air Int'l, Inc.*, 923 F.Supp. 1408, 1418 (D.Kan.1996), which states:

> The court has not located any case applying the bar against omitted counterclaims when the earlier action is still ongoing. This appears natural, since under Rule 13(e) a party who has failed to plead a counterclaim may obtain leave to subsequently advance that counterclaim when the interests of justice require. Since the [ ] litigation has not proceeded to any form of final resolution, the bar on omitted counterclaims, premised on whatever theory, does not apply.

*Id.* Lueker argues that the court's ruling in *Raytheon* is not dispositive in this case

because it is state law that governs the preclusive effect of a failure to raise a compulsory counterclaim. Lueker's statement of the law is correct. However, state law is silent on the issue of whether a counterclaim is, in fact, omitted prior to the time the initial case is terminated. Lueker cites *United States Fidelity & Guaranty Co. v. Maish,* 21 Kan.App.2d 885, 896–99, 908 P.2d 1329 (1995), in support of her argument. There, the Kansas Court of Appeals held that the means by which a case is terminated, i.e., by settlement or by a final judgment, is irrelevant to the preclusive effect of an omitted counterclaim. Both *Maish* and *Raytheon* undertook to discern whether Kansas law premises the compulsory counterclaim rule on res judicata or estoppel. The court need not delve into that distinction here. It is sufficient to conclude that *Maish* did not address the present situation. In *Maish,* settlement had terminated the initial case. Thus, no opportunity existed for the bringing of additional counterclaims. By comparison, Lueker's civil case is still pending, a situation not addressed by *Maish* or any other Kansas case. The court thus finds its decision in *Raytheon* to be proper and compelling precedent requiring the rejection of Lueker's argument.

### 2. Lueker's Liability Pursuant to Arceo's § 1983 Claims

Defendant Lueker next argues that she, as an allegedly private actor, is an improper defendant to Arceo's § 1983 claims. To state a claim under § 1983, Arceo must allege that a person acting under color of state law committed the claimed deprivation. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"

*Id.* at 49, 108 S.Ct. at 2255 (*quoting United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). Here, Arceo concedes that Lueker does not fall under the traditional definition of acting under color of state law.

■ Instead, Arceo seeks to employ the "joint action" standard to establish Lueker's § 1983 liability. In order to hold a private actor liable under § 1983, "it must be shown that the private person was jointly engaged with state officials in the challenged action, or has obtained significant aid from state officials, or that the private individual's conduct is in some other way chargeable to the State." *Pino v. Higgs,* 75 F.3d 1461, 1465 (10th Cir.1996) (quoting *Lee v. Town of Estes Park,* 820 F.2d 1112, 1114 (10th Cir.1987)). Under the "joint action" test, a § 1983 claim may arise when some private party acts "in concert" with (i.e., conspires with) state officials in effecting a particular deprivation of constitutional rights. *See Anaya v. Crossroads Managed Care Systems, Inc.,* 195 F.3d 584, 596 (10th Cir.1999); *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1453 (10th Cir.1995). In other words, the private party and state officials must "share a common, unconstitutional goal." *See Anaya,* 195 F.3d at 596 (*quoting Gallagher,* 49 F.3d at 1454 (*quoting Cunningham v. Southlake Ctr. for Mental Health, Inc.,* 924 F.2d 106, 107 (7th Cir. 1991))). The mere acquiescence of a state official in the actions of a private party is not sufficient. *See Gallagher,* 49 F.3d at 1453.

■ The Tenth Circuit has specifically addressed the "joint action" theory in the context of a private individual reporting information to the police or participating in a police investigation, as Lueker did in the present case. In *Lee v. Town of Estes Park,* 820 F.2d 1112, 1115 (10th Cir.1987), the circuit indicated that "the

mere furnishing of information to police officers who take action thereon does not constitute joint action under color of state law which renders a private actor liable under § 1983." *Id.* Similarly, in *Gallagher, supra,* the circuit found that for § 1983 liability to attach to the reporting party, the arrest must have stemmed from "concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Gallagher,* 49 F.3d at 1454. That case went further by concluding that, where the police make an independent decision to arrest, the reporting party was not acting under color of state law. *Id.* In summary, the court must examine the record in this case to determine if Lueker shared "a common, unconstitutional goal" with any of the state officials involved in this case.

At pages 60–61 of his response brief, Arceo argues that Lueker and Clark engaged in concerted action leading to the alleged violations of Arceo's constitutional rights. *See* Arceo's Combined Response, at 60–61. First, Arceo attempts to establish a "common goal" by pointing out that Lueker gave Clark some affidavits of third parties that Lueker had obtained in the course of her civil action. *See* defendant Clark's Motion for Summary Judgment, Ex. 9F; defendant Lueker's Reply, Ex. D. Lueker's activity in supplying information to Clark does not aid Arceo in establishing a common goal, or conspiracy. Police investigators frequently request information from any number of sources, especially from a complaining witness. Lueker's participation in the investigation in this manner does not establish a factual controversy as to the existence of a Clark/Lueker conspiracy.

Arceo next addresses the impact of Lueker's frequent contacts with Clark.

The record does reflect that Lueker was in frequent contact with Clark, that Lueker rode with Clark on a number of occasions to discuss the case, and that Lueker was with Clark "no more" than three times while Clark was conducting surveillance. The amount of time that Lueker spent with Clark may be unusual, although the record does not establish what might be considered a "normal" level of contact. However, even if Clark paid Lueker an unusual amount of attention or acted in an unusual manner by allowing Lueker to sit in his car during surveillance, such facts do not establish a conspiracy. While it appears Clark was providing Lueker with an unusual level of attention (again, the court notes that its finding in this regard cannot be conclusive because the record does not establish the typical level of interaction between an investigator and complaining witness), there is no evidence that the interaction impaired Clark's ability to make an independent decision or that Clark and Lueker shared a common, unconstitutional goal.

Next, Arceo relies on Rheanna Shaw's testimony indicating that Lueker told her that she and Clark had hugged and kissed, that Lueker called Clark her "undercover lover," and that Lueker bragged about having control over Clark. Shaw's testimony reflecting what Lueker said is pure hearsay and is not a proper consideration for summary judgment. Similarly, Shaw stated that she heard Clark tell Lueker that he would place handcuffs on Arceo "extra tight." Even if Arceo had submitted such facts in a competent form of evidence, they would not establish a conspiracy or a common, unconstitutional goal. For the sake of argument, even if the court grants Arceo the inference that Clark and Lueker were romantically involved, that simply provides a basis for inferring that Lueker had a heightened state of credibility in the eyes of Clark and

that Lueker may have manipulated Clark. Even assuming that Lueker exercised her romantic allures to make her story more believable, such facts do not establish that Clark and Lueker shared a common goal of violating Arceo's constitutional rights. The only inference is that Clark may have been more easily duped or manipulated. However, even if Lueker duped Clark, such action does not suggest that Clark engaged in a conspiracy with her. In other words, assuming for sake of argument that Arceo's insinuations are completely accurate, the inference is that Lueker's status may have impacted Clark's investigation, but there is no evidence or inference therefrom which suggests that Clark shared in Lueker's allegedly unconstitutional goals. For that reason, the court finds that Lueker was not acting under the color of state law and that she is thus not subject to § 1983 liability. The court grants defendant Lueker's motion as to her § 1983 liability.

### 3. Statute of Limitations Defense to State Law False Arrest/Imprisonment

 Lueker next argues, as do other defendants, that Arceo's state law claims of false arrest/imprisonment are time barred. Under Kansas law, the terms "false arrest" and "false imprisonment" are both used to mean "any unlawful physical restraint by one of another's liberty, whether in prison or elsewhere." *Gariety v. Fleming*, 121 Kan. 42, 45, 245 P. 1054 (1926). K.S.A. 60–514(b) specifies that "[a]n action for assault, battery, malicious prosecution, or false imprisonment" shall be brought within one year. The one-year statute of limitations thus governs Arceo's claims. The pertinent dates are as follows: Arceo commenced the present lawsuit on July 31, 2000; the alleged false arrest occurred on October 22, 1998 with the alleged false imprisonment extending from that date until March 31, 1999; and

the state dropped the charges in Case Nos. 98–1424 and 99–764 on August 2, 1999. The parties disagree over the proper commencement of the statutory period. Defendants posit that, at the latest, the limitations period commenced on March 31, 1999, the date the alleged false imprisonment terminated. Pursuant to defendants' theory, Arceo was at least four months late in filing his false arrest/imprisonment claim. Arceo argues, however, that the period should not commence until the date when the state dismissed the underlying criminal case, August 2, 1999. Arceo references the case of *Hill v. Day*, 168 Kan. 604, 609–610, 215 P.2d 219 (1950) to support his contention that a conviction in the underlying criminal case is a complete defense to a false arrest claim. He thus asserts that he could not have successfully brought a false imprisonment claim until dismissal of the underlying cases. Defendants respond by noting that dismissal or termination of the underlying criminal action is not an element of false arrest/imprisonment as it is with malicious prosecution. *See Thompson v. General Finance Co.*, 205 Kan. 76, 88, 468 P.2d 269 (1970) ("In an action for false arrest or false imprisonment, all that is necessary is that the individual be restrained of his liberty without any sufficient legal cause therefor, and by words or acts which the one being restrained fears to disregard.").

 The court, after a diligent search, has not located any Kansas cases directly addressing the present point. In fact, the court could not locate any District of Kansas or Tenth Circuit case that directly answered the issue. However, the court concludes that Arceo's argument is flawed. As a general rule, a cause of action accrues as soon as the right to maintain a legal action arises. The true test to determine when an action accrues is that point in time at which Arceo could first have filed

and prosecuted an action to a successful conclusion. *Pancake House, Inc. v. Redmond,* 239 Kan. 83, 87, 716 P.2d 575 (1986). For purposes of a § 1983 false arrest/prosecution claim, the Tenth Circuit recognizes that "claims arising out of police actions toward a criminal suspect, such as arrest, interrogation, or search and seizure, are presumed to have accrued when the actions actually occur." *Johnson v. Johnson County Comm'n Bd.,* 925 F.2d 1299, 1301 (10th Cir.1991). The Third Circuit has stated more clearly that in a § 1983 claim for false arrest, the plaintiff has "reason to know of the injury" on the date of the arrest, and, thus, the cause of action accrues on that date. *Rose v. Bartle,* 871 F.2d 331, 350 (3d Cir.1989). Because the court is addressing Arceo's state law claims, these authorities are merely persuasive. However, in the absence of Kansas state law precedent, the court must consider all forms of instruction in reaching a determination. In the case of *Montgomery v. De Simone,* 159 F.3d 120 (3d. Cir.1998), the Third Circuit directly addressed the present issue in the context of a federal law wrongful arrest claim. *Montgomery* held that, despite an ensuing criminal action which was dismissed in his favor, the plaintiff knew of his injuries at the time of his arrest. *See id.* Following the reasoning of the Third and Tenth Circuits, the court concludes that Arceo recognized the full extent of his injuries, at the latest, when his detention ended on March 31, 1999. Arceo's right to sue arose at that time. Arceo's argument attempts to turn a potential defense, or the absence thereof, into an element of his false arrest/imprisonment claim. Because all of the elements of Arceo's alleged injury were manifested by March 31, 1999, the limitations period began to run at that

time. The court thus concludes that Arceo's state law false arrest/imprisonment claims are time barred, except as to defendant City.[7]

### 3. Malicious Prosecution Claim Against Defendant Lueker

■ The court initially notes that Lueker asserts that Arceo's claims of false arrest/imprisonment against her fail on the merits, but the court need not reach that issue given its rulings as to Lueker's § 1983 liability and the time bar on Arceo's state law false arrest/imprisonment claims. In this section, the court will address Arceo's malicious prosecution claim against Lueker. To state a claim of malicious prosecution under Kansas law, Arceo must establish each of the following five elements: (1) defendant initiated, continued, or procured the proceeding of which Arceo now complains; (2) defendant acted without probable cause; (3) defendant acted with malice; (4) the proceedings terminated in favor of Arceo; and (5) Arceo sustained damages. *Lindenman v. Umscheid,* 255 Kan. 610, 624, 875 P.2d 964, 974 (1994) (*citing Nelson v. Miller,* 227 Kan. 271, 276, 607 P.2d 438, 443 (1980)).

■ Defendant Lueker's motion for summary judgment brings each of these elements into issue. As to the first element, to establish that the defendant initiated the criminal proceeding, Kansas case law is clear that the defendant must have acted affirmatively in instigating or participating in the prosecution. *Barnes v. Danner,* 169 Kan. 32, 216 P.2d 804, 807 (1950). As in a cause of action for false imprisonment, merely reporting facts to a law enforcement officer who then deems a crime to have been committed and directs the defendant's arrest is not sufficient to es-

---

**7.** The City concedes that pursuant to the notice and tolling provisions of K.S.A. 12–105b, the City remains potentially liable for one day

of allegedly unlawful detention. While this is true, the City is not liable on other grounds, as set forth below.

tablish this element. *Id.* Persons supplying information to a public prosecutor will not be liable for malicious prosecution when the prosecutor initiates criminal proceedings, if the person supplies the information in good faith and represents all the information available to the informant through diligent effort. *Nelson v. Miller,* 227 Kan. 271, 279, 607 P.2d 438 (1980). This court further instructed that "generally a third person's giving of certain information to a public prosecutor does not constitute the procurement of proceedings if the decision to prosecute is left entirely to the uncontrolled discretion of the prosecuting officer, or if the officer conducts an independent investigation, or if he prosecutes on a different offense than that being accused." *Slavens v. Crossman,* Case No. 86–1347, 1989 WL 79068, (D.Kan. June 14, 1989). The Restatement (Second) of Torts further clarifies the issue, as follows:

When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in this Section even though the information proves to be false and his belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings

initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Restatement (Second) of Torts § 653 cmt. g (1976). Based on Kansas law, the court concludes that Lueker cannot be liable for the independent decision of the prosecutor unless she made an exercise of the prosecutor's discretion impossible by providing knowingly false information upon which the prosecutor based his decision. Despite the confusing nature of this case, Arceo's claim of malicious prosecution centers on the prosecution and related detention in Case No. 98–1424, which rose out of the September 15/16 incident involving the vandalism and alleged attempted arson of Lueker's vehicle. While Arceo implies that Lueker provided false information to the police, he does not provide any sound basis for concluding that any of Lueker's alleged falsehoods led to the prosecution of Case No. 98–1424. Arceo's failure to brief the present issue has undoubtedly made the court's analysis more difficult. However, at pages 58–60 of Arceo's response brief, he addresses the alleged wrongdoings or misinformations perpetrated by Lueker. Arceo discusses Lueker's reporting of the alleged vandalism to the police and states that the police found no "direct evidence" to implicate Arceo. *See id.* at 58–59. However, Arceo does not allege, nor provide any evidence to support a conclusion that, Lueker had lied to police about the incident. On the other hand, Lueker presents uncontroverted evidence that she simply reported to police the condition in which she found her vehicle. Arceo has failed to create a factual controversy regarding whether Lueker lied to police in order to procure the prosecution of Arceo in Case No. 98–1424. On page 60 of

his response, Arceo moves in the necessary direction by citing Rheanna Shaw's testimony that Lueker had called herself "the trickster" in regard to reporting the alleged vandalism and threat. However, this is pure hearsay testimony seeking to prove the truth of the matter asserted, i.e., that Lueker tricked police by lying about the incident.

Arceo also argues that Lueker lied to Clark about the South Park incident. Clearly, there is evidence to create a controversy as to Lueker's veracity in the reporting of the incident. However, the South Park incident has no bearing on Arceo's claim for malicious prosecution. It is uncontroverted that no charges were pursued based on the incident. As such, Arceo's discussion of Lueker's alleged fabrication does not indicate, in any way, that she procured the prosecution of Case No. 98–1424 because that case did not address the allegedly fabricated incident. While Arceo fails to mention the Villa report, which alleged that Lueker had unsuccessfully sought to procure two individuals' assistance in planting false evidence at Arceo's residence, the court considers the Villa allegation and concludes that it has no impact on the present issue. Again, Lueker's allegedly fraudulent behavior did not act to initiate or procure the prosecution because the prosecutor did not base his decision to prosecute on any false evidence generated by Lueker's allegedly fraudulent scheme. In short, while controversy may exist as to Lueker's general veracity, Arceo has failed to create a genuine issue of fact about the veracity of Lueker's reports which directly lead to the 98–1424 prosecution. Specifically, Arceo did not raise any controversy as to the veracity of Lueker's reports regarding the alleged vehicle vandalism. Because the court concludes that Lueker did not lie in her reports to police regarding the relevant incident, it must also conclude that the prosecutor exercised uncontrolled dis-

cretion in deciding to prosecute Case No. 98–1424. Such an exercise of uncontrolled discretion is sufficient to insulate the complaining witness, Lueker, from the status of a procurer or institutor of the prosecution. Because Arceo has failed as a matter of law to prove the initial element of his malicious prosecution claim against Lueker, the court grants Lueker's motion for summary judgment as to that claim. Because the court's rulings grant judgment in favor of Lueker on all of Arceo's claims against her, she is dismissed from the action.

## C. Defendant Warren's Motion

In his brief in support of his motion for summary judgment, Warren asks the court to declare that Arceo failed to sue him in his individual capacity because the complaint failed to specify Warren's capacity. Warren argues that the law presumes, in the absence of a clear expression of intent otherwise, that suits against officials are in their official capacity only. Arceo disputes Warren's interpretation.

The court notes that Arceo's complaint does not indicate whether he is suing Warren in his official or individual capacity. However, this omission does not have the impact argued by Warren. The United States Supreme Court stated in *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), "[i]n many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. 'The course of proceedings' in such cases typically will indicate the nature of the liability sought." *Id.* at 167 n. 14, 105 S.Ct. 3099 (*quoting Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)). Similarly, the Tenth Circuit instructs that where, as here, the plaintiff fails to specify the matter in the complaint, the court looks to "the substance of the pleadings

and the course of the proceedings" to determine whether the plaintiff is suing the defendants in their individual capacities or their official capacities, or both. *Pride v. Does*, 997 F.2d 712, 715 (10th Cir.1993). Here, "the substance of the pleadings and the course of the proceedings" establish that Arceo sued Warren in both his individual and official capacities. Specifically, Arceo alleged punitive damages in his complaint, which the law can only levy against state officials in their individual capacities. The nature of the arguments in this case also suggests an understanding that Arceo was suing the individual defendants in their individual capacities. The court concludes that Arceo's claims properly reach Warren in his individual capacity.

■ Both Warren and the City argue that Arceo's state law malicious prosecution claim falls victim to the one-year statute of limitations pursuant to K.S.A. 60–514. This argument is without merit. As noted above, an essential element of the malicious prosecution cause of action is that the underlying criminal proceeding terminated in favor of Arceo. In this case, Arceo could not have established that element until August 2, 1999. By filing his complaint on July 31, 2000, Arceo clearly filed his state law malicious prosecution claim within one year from the time the cause of action accrued.

■ Next, Warren asserts his entitlement to both absolute and qualified immunity. As to absolute immunity, Warren argues that the officers who arrested Arceo are entitled to such protection because they carried out the arrest pursuant to court order. Warren couches his argument in terms of quasi-judicial function. Warren's argument finds some support in *Valdez v. City and County of Denver*, 878 F.2d 1285 (10th Cir.1989), where the Tenth Circuit held that several peace officers who had enforced a state court's contempt order were absolutely immune from damages for the contemnor's claims of false arrest and imprisonment. *See also Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238–39 (7th Cir.1986) (law enforcement officers have absolute immunity in executing facially valid court order). However, Arceo is not complaining about the officers' actions in executing a search warrant, but about their actions in applying for the warrant. Arceo is alleging that JCPD officers violated his rights by failing to adequately investigate the case against him before giving the case to prosecutors to seek arrest warrants. Arceo asserts that Warren is liable in his administrative and investigatory role over those officers. The court is not aware of any case that extends absolute immunity to alleged wrongful acts committed in an effort to obtain an arrest warrant, as compared to actions taken at the direction of the court in execution of a warrant.

■ The issue requiring greater attention is Warren's assertion of individual qualified immunity as to all of Arceo's claims against him. "After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff," who "must first establish that the defendant's actions violated a constitutional or statutory right." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir.2001). The court must consider whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. This must be the initial inquiry. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In the present case, it is also the only inquiry as there is little doubt that the law clearly established the right at issue at the time of the allegedly unlawful conduct. In short, although the court will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate that

Arceo has satisfied his heavy burden in establishing a violation of a constitutional right perpetrated by Warren; otherwise, Warren is entitled to qualified immunity. *Medina,* 252 F.3d at 1128 (citations omitted).

As with all defendants, Arceo asserts that Warren violated his constitutional rights under the Fourth and Fourteenth Amendments by falsely arresting and imprisoning him and by maliciously prosecuting him. Arceo bears the burden of establishing that Warren violated these rights either individually or in his supervisory capacity. At pages 63–65 of his response brief, Arceo addresses the factual allegations forming the basis of his claims against Warren. Arceo's factual recitation fails to specifically relate the allegations to the elemental requirements of either of the above claims. In fact, the court cannot determine which of the accusations apply to false arrest/imprisonment and which apply to the malicious prosecution claim. Arceo's section heading suggests that the recitation's aim is to establish that Warren acted without probable cause in regard to Arceo's arrest and detention and subsequent prosecution.

Initially, the court notes that the cornerstone issue in a claim for false arrest/imprisonment is whether the arrest was based on probable cause. In the present context, Arceo relies on the theories set forth in *Taylor v. Meacham,* 82 F.3d 1556 (10th Cir.1996). There, the circuit noted that "it is a violation of the Fourth Amendment for an arrest warrant affiant to 'knowingly, or with reckless disregard for the truth,' include false statements in the affidavit." *Id.* at 1562 (*quoting Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978)). Additionally, it is a Fourth Amendment violation to "knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable

cause." *Id.* (*citing Stewart v. Donges,* 915 F.2d 572, 581–83 (10th Cir.1990)). Such violations can form the basis of a false arrest or malicious prosecution claim.

After reviewing the factual allegations surrounding Warren, the court cannot ascertain how Arceo seeks to prove that Warren was directly involved in the false arrest. Indeed, the uncontroverted facts indicate that Warren had no direct involvement in the procurement of the arrest warrant or in the actual arrest of Arceo. The arrest warrant was issued based on information provided solely by Clark who in turn received that information primarily from Lueker. Undoubtedly, Warren had some knowledge of and input into Clark's investigation, but Warren did not directly participate in the procurement of the warrant. In fact, Warren did not even review Clark's reports prior to their delivery to the prosecutor. Clark's immediate supervisors performed that task. Arceo has failed to establish that Warren personally procured his arrest or that he participated in or approved of the acquisition of the arrest warrant. The court thus concludes that Warren did not personally take positive action to violate Arceo's constitutional right to be free from a false arrest. For the same reasons, the court finds that Warren did not personally take affirmative steps to procure criminal proceedings against Arceo. As procurement (or initiation/continuation) of the proceeding is a required element of Arceo's malicious prosecution claim, Arceo has failed to overcome Warren's assertion of qualified immunity in regard to both false arrest/imprisonment and malicious prosecution.

■ However, the court must also consider whether Warren is liable in his supervisory capacity for the alleged violations. Under § 1983, a supervisor is only liable if the plaintiff shows that "an 'affirmative link' exists between the [constitu-

tional] deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'" *Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir.1997) (*quoting Meade v. Grubbs,* 841 F.2d 1512, 1527 (10th Cir. 1988)). *See also Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir.1990) ("Plaintiffs must show that a supervisory defendant, expressly or otherwise, authorized, supervised, or participated in conduct which caused the constitutional deprivation.").

Arceo has failed to create a genuine issue of fact as to Warren's supervisory liability. The court has already concluded that Warren did not personally engage in the alleged constitutional violations. The court also notes that Warren is not Clark's immediate supervisor. Clark's immediate supervisors, Captain Winters and Lieutenant Rasmussen, were in direct control of all detectives. Given the authority structure in the JCPD, the court concludes that there is not an affirmative link between Warren's failure to supervise, if any, and the alleged constitutional deprivations.

The remaining question then is whether Warren authorized or acquiesced in any alleged constitutional violations. Warren's knowledge of Clark's investigation seems to be the crux of Arceo's allegations. The court will thus address Warren's knowledge of the investigation in detail. Arceo first notes, on page 63 of his response brief, that "Warren had been told by Pacquette on September 16 or 17 that Arceo was not involved in the alleged vandalism." Pacquette never substantiated his accusations, but, nonetheless, Warren took action by offering to allow Arceo to take the CVSA test and to instruct Captain Winters that another potential suspect might be present. Warren Depo, p. 49. Such actions do not indicate that Warren had any knowledge that Lueker might be lying or that Clark might be engaged in wrongful conduct. Arceo goes on to discuss the frequency of Warren's briefings on the Arceo investigation by Clark and Warren's involvement in the decision to instruct Clark to conduct additional surveillance in the Arceo case. As noted in the court's statement of uncontroverted facts, Clark did keep Warren informed of his investigation and Warren and Winters did agree that Clark should conduct surveillance. Neither of these facts suggests that Warren authorized or acquiesced in Clark's allegedly unconstitutional conduct. That Clark discussed the investigation with Warren is uncontroverted. However, Arceo's allegations do not suggest that Clark informed Warren of any alleged wrongdoing on his part, or that Warren had reason to know of Clark's allegedly wrongful acts based on Clark's communications. Additionally, the instruction to conduct additional surveillance does not raise any inference of Warren's knowledge of alleged wrongdoing.

Next, Arceo discusses a phone call between a Tom Rolf, a Central National Bank representative, and Warren. Rolf's notes of the phone call are attached as Exhibit 4b to Arceo's response brief. The call discussed Warren's frustration at the Central National Bank for allegedly interfering in the Arceo investigation. Arceo raises the issue of the phone call to establish Warren's malice toward Arceo. Given the court's current analysis of Warren's liability, malice is not presently relevant. The relevant conclusion is that the phone call does not establish that Warren authorized or had knowledge of Clark's allegedly unconstitutional behavior.

The allegations in the first full paragraph of page 64 of Arceo's response brief suggest that Warren had some concern about the validity of Lueker's claims regarding the South Park incident and that Warren did not mention those concerns to the prosecutor. The court finds this accu-

sation to be irrelevant to Warren's liability. It is clear from the facts that Clark doubted the veracity of Lueker's account of the South Park incident. In fact, Clark, in large part, did not report the alleged incident and certainly did not investigate the incident to any significant extent. Because neither Clark nor Warren gave credence to Lueker's account of the incident, the police did not forward the allegation to the prosecutor and the prosecutor did not file charges based on the South Park incident. Presumably, Arceo asserts that Warren should have relayed his belief that Lueker had lied to the prosecutor and committed a constitutional violation by failing to do so. The court disagrees for the reasons set forth below in regard to defendant Clark's motion.

In the next paragraph of Arceo's brief, he boldly asserts that "Warren's involvement in the investigation of Lueker's report is sufficient to conclude that either he also had reasons to disbelieve her claims or his indifference rises to the level of reckless conduct." Arceo's Response Brief, at 64. This bald allegation is entirely unsupported by the record. The record reflects that Warren received reports from Clark, but does not suggest that any of those reports indicated that Lueker might have been fabricating the vandalism and threats. Warren disbelieved Lueker's claims relative to the South Park incident, but as noted above, the prosecutor brought no claims on the basis of that incident. The record reflects that Warren's only active participation in the investigation was his joint decision with Captain Winters to authorize additional surveillance in the Arceo case. The court cannot ascertain how such involvement demonstrates Warren's actual or constructive knowledge that Clark was perpetrating an alleged constitutional violation.

Arceo next refers back to Rolf's notes from the phone call with Warren, which took place the day after Arceo was arrested. Rolf's notes suggest that Warren had a grasp of the details of the Arceo investigation. This is consistent with the court's findings, as Clark kept Warren informed as to the status of the investigation. However, as discussed above, knowledge of the investigation does not equate to knowledge that Lueker was lying about the vandalism and threat. If Warren did not know or have reason to know that Lueker was lying or that Clark was lying (intentionally or recklessly) or omitting information from his reports to the prosecutor, then Warren did not authorize or acquiesce in the alleged constitutional violation.

Finally, Arceo relies on the investigatory report from the City's own investigation into this matter. That report concluded that Warren a) played an active role in the case, b) supervised an incompetent investigation, and c) failed to reevaluate Lueker's allegations in light of the alleged fabrication of the South Park incident. The reporters' conclusions, to the extent they are relevant, do not create factual controversy. They simply represent an opinion, which is clearly not binding on this court's analysis of the facts actually and properly before it. Based on the facts in the record, the court concludes that Warren did not direct Clark to interview any specific individuals or to gather any specific information. He merely engaged in a joint decision that Clark should conduct additional surveillance in the case. Captain Winters was Clark's immediate supervisor and reviewed all of Clark's reports before forwarding them to the prosecutor without any involvement on Warren's part. Winters reviewed Clark's affidavit in support of the arrest warrant, and Clark was unaware of any other review of the affidavit. Clark Depo, at 21–22. There is no evidence in the record to suggest that Warren knew or had reason to know that Lueker was lying about the vandalism incident or that Clark was omit-

ting critical information from his submissions to the prosecutor. The court thus concludes that Warren did not authorize nor acquiesce in Clark's alleged violation of Arceo's constitutional rights and that he is therefore not subject to supervisory liability. Because Arceo has failed to carry his burden of showing Warren's violation of a constitutional right, Warren's assertion of qualified immunity stands. The court grants Warren's motion for summary judgment as to Arceo's § 1983 claims. Additionally, the court finds that Warren is immunized from liability under the KTCA § 75–6104(i) because he has qualified immunity from suit pursuant to federal law under 42 U.S.C. § 1983. The court grants Warren's motion as to Arceo's state law malicious prosecution claim pursuant to state law immunity and Arceo's state law false arrest/imprisonment claim pursuant to its being time barred, as discussed above. Because the court's rulings eliminate all claims against Warren, he is dismissed from this proceeding.

### D. Defendant Clark's Motion

▮▮▮ The court will move directly to the merits of Clark's motion. Clark asserts that he is entitled to qualified immunity because he did not violate Arceo's constitutional rights. Arceo contends that Clark did violate the Fourth Amendment by submitting an affidavit in support of an arrest warrant which omitted material information. Specifically, Arceo asserts that Clark was reckless to have not included in the affidavit his misgivings regarding Lueker's account of the alleged South Park incident. As noted above, it is a violation of the Fourth Amendment for an affiant to knowingly and intentionally, or with reckless disregard for the truth, make a false statement in an affidavit. *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Arceo does not allege that Clark included false statements in his affidavit, but instead asserts

an omission. Toward that end, it is a Fourth Amendment violation to "knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause." *Stewart v. Donges*, 915 F.2d 572, 581–83 (10th Cir. 1990). In a case involving information omitted from an affidavit, the existence of probable cause is determined "by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." *Stewart*, 915 F.2d at 582, n. 13. The issue is thus whether Clark's probable cause affidavit supported a finding of probable cause once the court includes the omitted information. A critical inquiry, of course, is the exact nature of the omitted information. An examination of Clark's affidavit in support of the arrest warrant, Clark's Brief in Support at Ex. 9, reveals that Clark did, in fact, mention Lueker's account of the South Park incident. However, he said nothing more about the incident. He did not indicate why little or no investigation took place. Specifically, Clark did not indicate that he found Lueker's claims to be suspect. The court concludes that the omission of Clark's suspicions from the affidavit did not vitiate the probable cause to arrest Arceo for the vehicle vandalism.

First, the facts in the affidavit clearly established probable cause to arrest. Under Kansas law, probable cause exists when there are "reasonable grounds for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining." *Lindenman v. Umscheid*, 255 Kan. at 624, 875 P.2d at 974. Under federal law, "probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime."

*Wolford,* 78 F.3d at 489. Probable cause is a question of law for the court unless material facts necessary to a finding of probable cause are in dispute. *Stohr v. Donahue,* 215 Kan. 528, 530, 527 P.2d 983, 985 (1974). Additionally, probable cause need only be found for one of the crimes of which Arceo was charged. *See Elbrader v. Blevins,* 757 F.Supp. 1174 (D.Kan.1991).

Clark's affidavit indicates that in the early morning of September 16, 1998, police found Lueker's vehicle vandalized with a military sticker over the tailpipe and the message "It's not over I told you—you don't know what I can do to you Now your [sic] dead." The message itself reflects a prior relationship, which implicates Arceo due to his long history of threats and domestic violence with Lueker. Clark's affidavit listed a veritable laundry list of prior occurrences between the couple. Two days before the vandalism, Arceo had been sentenced to thirty days in jail for his abuse of Lueker. The sentence was set to commence the morning of the 16th. Other circumstantial evidence was found at the scene. A patch from Arceo's military reserve unit covered the tailpipe. Police believed the writing could have been from military face paint.

Other individuals corroborated the fact that Arceo had previously threatened Lueker. Both Jimmy Mullenaux and Jennifer Stegmier claim they heard Arceo, on separate occasions, threaten Lueker. Karen Pruitt claimed that Arceo had hit her when they were dating and had admitted that he had been physical with Lueker. Additionally, Clark indicated that Arceo had failed the CVSA test and evidenced deception in regard to questions dealing with the vehicle vandalism. Clark presented the prosecutor with all of this information. The court concludes that, as a matter of law, Clark's affidavit presented sufficient facts to establish a reasonable grounds for suspicion or a substantial probability that Arceo vandalized Lueker's vehicle and wrote the threat therein.

Second, the addition of Clark's belief that Lueker may have lied in regard to the South Park incident has little impact on the probable cause calculus. The South Park incident was unrelated to the vehicle vandalism other than the fact that Lueker believed that one of Arceo's friends may have been involved. The fact that Lueker may have lied about one occasion does not require the conclusion that she lied about the vandalism. Arceo implies that Clark should have known that Lueker was framing Arceo. Requiring such a conclusion of Clark is simply not justified. The facts do not indicate that he had any specific reason to believe that Lueker was lying; he simply felt her story was suspect. By comparison, both circumstantial and historical evidence supported the vehicle vandalism in that Arceo had an apparent history and reputation for threatening Lueker. Further, evidence of the vehicle vandalism was present at the scene of the incident. Clark's opinion that Lueker may have fabricated the South Park incident is only that—an opinion. An officer's opinion that a witness might have lied about a factually distinct and separate circumstance simply does not carry great weight in the probable cause analysis. Because the omission of his belief as to Lueker's veracity regarding the South Park incident is not sufficient to vitiate the probable cause otherwise present, the court finds that Clark's omission did not violate Arceo's constitutional rights. Clark is thus entitled to qualified immunity. Pursuant to that immunity and to KTCA § 75–6104(i), the court grants his motion for summary judgment as to all Arceo's claims and dismisses Clark from this action. Finally, because none of its employees are liable, the City cannot be found liable. The court thus grants the City's motion for summary judgment, dis-

misses the action, and denies all other pending motions, as set forth below, as moot.

IT IS THEREFORE ORDERED this ____ day of January, 2002 that defendant Junction City's motion for summary judgment (dkt. no. 135) is granted; defendant Warren's motion for summary judgment (dkt. no. 139) is granted; defendant Lueker's motion for summary judgment (dkt. no. 141) is granted; defendant Clark's motion for summary judgment (dkt. no. 143) is granted. All other pending motions (dkt.nos.145, 146, 147, 165, 189–1, 189–2) are denied as moot.